CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
MICHAEL D. DRISCOLL, JR. (Bar No. 302507)
(E-Mail: michael_driscoll@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-6624
Facsimile: (213) 894-0081

Attorneys for Defendant
MARLON MOODY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 2:21-CR-239-DSF |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT'S SENTENCING MEMORANDUM AND RESPONSE TO THE PRESENTENCE INVESTIGATION REPORT; EXHIBITS** |
| MARLON MOODY, | |
| Defendant. | |

Marlon Moody, by and through his counsel of record Deputy Federal Public Defender Michael Driscoll, hereby submits this sentencing memorandum and response to the Presentence Investigation Report ("PSR").

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: June 16, 2022      By  /s/ Michael D. Driscoll, Jr.
MICHAEL D. DRISCOLL, JR.
Deputy Federal Public Defender
Attorney for MARLON MOODY

i

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Marlon Moody "is truly ashamed of what he has done and is making efforts to correct this misconduct." Ex. A (Ltr. of Shadract Ariola). He began this process almost immediately. Within days of taking gold bars that had fallen from the proverbial sky and were left unattended at LAX's cargo area, he had confessed to the FBI, returned the gold bars he had, and convinced his co-defendant to return *his* bar. Even the government notes his critical role in ensuring there was no actual loss here when it describes how his codefendant "initially repeatedly lied [to law enforcement], denying he was involved in the theft until [Mr.] Moody convinced him to admit the truth." (*See* ECF No. 46 at 8:28-9:4.) A year later, he was arrested and pleaded guilty a mere 10 days after that, again evincing his true remorse.[1]

Mr. Moody now stands before the Court for sentencing, having pleaded guilty to conspiring to commit theft of an interstate or foreign shipment. (ECF Nos. 31 ("Plea Agreement"), 40 (Minutes of Change of Plea).) At his core, Mr. Moody is a hardworking family man; he immigrated from Belize, has known only blue-collar type jobs, and helps his aging mother, disabled brother, and his wife and two stepsons with whatever money or other support he can. He recognizes his grave error here, where he succumbed to a temptation to take a shortcut that cuts against how he has acted throughout his life and how he wants his stepchildren to act in the future should they ever face similar circumstances. There is no excuse for greed or taking an illegal shortcut. But given his early and complete acceptance of responsibility, difficult upbringing, lack of any other criminal history, and the truly aberrant circumstances

---

[1] Mr. Moody's misconduct occurred in April 2020, during the nascency of the unparalleled global COVID-19 pandemic. Mr. Moody was considered an essential worker at those times, helping unload and move cargo shipments at LAX during incredibly uncertain and terrifying times. He was indicted a little over a year later, having already admitted his misconduct to the government and helping to make sure all the gold bars were returned; no pre-indictment resolution was offered that the defense is aware of. Even so, upon his eventual arrest and indictment, he again immediately accepted responsibility for his misconduct.

1

surrounding this crime, the defense submits that a noncustodial sentence is "sufficient, but not greater than necessary," to accomplish the goals of sentencing here.  18 U.S.C. § 3553(a).

## II.   RESPONSE TO THE PSR AND THE GOVERNMENT'S GUIDELINES ANALYSIS

The PSR calculates the applicable Guidelines as follows:  A base offense level of 6, a +10 enhancement because the market value of the gold bars totaled over $150,000, and an additional +2 enhancement because the offense involved goods from a cargo shipment, which mirrors the agreed-upon figures in the Plea Agreement.  (ECF No. 64 ("Revised PSR") at 3, ¶3; Plea Agreement at ¶15.)  The PSR then subtracts 3 levels for acceptance of responsibility, resulting in a total offense level of 15.  With no criminal history, Mr. Moody's resulting Guidelines range is 18-24 months in custody.  The Probation Office then recommends a slight variance to 15 months in custody; it does not explicitly adopt the parties' agreed-upon 2-level variance due to the COVID-19 pandemic, though its recommendation is within that range.  (*See* ECF No. 42 at 1.)

The government arrives at the same Total Offense Level of 15 by a different route.  It begins by arguing that a 2-level enhancement should apply because Mr. Moody was a leader or organizer, and then adopts the parties' agreed upon 2-level COVID-19 variance.  (ECF No. 47 at 4-7.)  The defense joins the Probation Office: the leadership enhancement does not apply here.  The Probation Office determined that "[Mr.] Moody has not exercised sufficient control of" his co-defendant.  (ECF No. 65 (First Addendum).)  This is correct.  Mr. Moody's conduct does not evidence his *control* over others to a degree necessary for this enhancement to apply.  This was a crime of opportunity, where gold bars were misplaced by others, Mr. Moody found them, and Mr. Moody told his coworker about them and gave him and J.S. one.  He deeply regrets his greed in taking and sharing these bars.  But the government has not proven that Mr. Moody has shown the necessary level of control to merit the enhancement; indeed, it admits that it "is unclear" whether he even recruited his co-

2

defendant. (ECF No. 47 at 7-12.) This was a crime of opportunity and greed, not one of the required planning and organizing required to apply the enhancement. *Cf.* U.S.S.G. §3B1.1, App. Note 4 ("This adjustment does not apply to a defendant who merely suggests committing the offense.").

Accordingly, the defense submits that the appropriate Guidelines calculation mirrors that in the PSR and the Plea Agreement; it does not include an inapplicable enhancement for a leadership role. That brings Mr. Moody's Total Offense Level to 13 (after applying the agreed-upon 2-level COVID-19 variance). At criminal history category 1, his resulting range is 12-18 months. Finally, the defense submits that an aberrant behavior downward departure is appropriate here and supports a noncustodial sentence. U.S.S.G. § 5K2.20. Mr. Moody's misconduct was a "single criminal transaction . . . without significant planning . . . of limited duration[,] and represents a marked deviation by the defendant from an otherwise law-abiding life." *Id.* § 5K2.20(b).

On April 23, 2020, Mr. Moody found a box of gold bars that had been misplaced by others who were unloading cargo at LAX. He went back and took four bars, and then gave one to his coworker and one to J.S. The events thus occurred over a limited duration of mere hours; while he held on to the bars, he also admitted his misconduct and helped the government locate and retrieve all the stolen bars. As stated earlier, this was a crime of opportunity that stands in marked contrast to Mr. Moody's life otherwise, as he has no criminal history. In sum, the aberrant nature of the offense here further supports a noncustodial sentence.[2]

---

[2] The defense has no other objections to the PSR and is in the process of providing additional financial forms to the Probation Office to illustrate that a fine is inappropriate here.

### III. A PROBATIONARY SENTENCE IS SUFFICIENT GIVEN MR. MOODY'S DIFFICULT UPBRINGING IN BELIZE, COMMITMENT TO FAMILY, AND FULSOME ACCEPTANCE OF RESPONSIBILITY

The PSR accurately recounts Mr. Moody's biographical information. Below, we supplement that account to provide the Court a fuller understanding of who Mr. Moody is, including his misconduct but not entirely defined by, and the trials and tribulations he has overcome in immigrating to the United States and providing for his family despite his limited means.

### A. Mr. Moody Grew Up in Belize Before Immigrating to the United States

Mr. Moody was born in Belize City, Belize, in 1982. (PSR ¶ 59.) Growing up in Belize was difficult, especially in a household with his three siblings and abusive father. It was not uncommon for Mr. Moody to witness his parents fighting, verbally and physically, events made all the worse by the father's drug addiction. Indeed, as his friend Shadract Ariola writes, Mr. Moody grew up in "one of the roughest neighborhoods in Belize City" at that time, yet Mr. Moody was "never influence[d] by gangs or [the] streets [mentality]." Ex. A (Ltr. of Shadract Ariola). Unsurprisingly, there were financial consequences to his father's drug addiction too, as he did not support the family in any meaningful ways; his mother was left trying to support the family on a janitor's salary. In the community, the family often borrowed money to quite literally keep the lights on. (PSR ¶ 62.)

After his parents separated,[3] Mr. Moody's mother re-married and things began to improve. He gained two half-sisters, and his stepfather stepped into a true fatherhood role for Mr. Moody (a role that Mr. Moody now occupies for his own stepchildren). (PSR ¶¶ 61-63.) He taught Mr. Moody the carpentry trade and instilled in him the importance of hard work. Bonding over a shared experience and craft helped Mr.

---

[3] Mr. Moody had a complicated relationship with his biological father since this separation, made all the more difficult by Mr. Moody's inability to afford to travel back to Belize for his funeral to have true closure.

Moody and his stepfather grow close from a young age, which was made all the more significant because Mr. Moody was often absent from school due to his severe asthma. (*Id.*) It also helped Mr. Moody develop friends and help young children stay out of the gang life: "Mr. Moody would often have some of the neighborhood children at his family woodwork shop teaching the skills of the work, helping those children escape the mean streets of Belize City." Ex. A (Ltr. of Shadract Ariola). While he dreamed of going to college, he was never able to; the demands of his family and their limited financial means forced him into the workplace upon graduating high school. (PSR ¶¶ 61-63.) He has been working ever since.

Despite having little means, Mr. Moody made a point of helping out his family and friends whenever he could. His friend, Moises Shoman, who has known him for over 20 years, recalls how Mr. Moody "would always help anyone that needs help, it can be financial situation, a shoulder to lean on, or just an ear when you want to talk." Ex. B (Ltr. of Moises Shoman). All in all, Mr. Moody was not raised in a traditional home in Belize; he grew up around domestic violence, drugs, and the ever-present fear of gang activity. Yet he was able to stay above the fray by leaning on his family and focusing on hard work, even though it meant he would not fulfill his dream of going to college.

**B.     Mr. Moody Immigrates to the United States with His Family to Build a Better Life**

In 2009, Mr. Moody and his family decided to immigrate to the United States. His first stop was in Chicago, Illinois, at the beginning of winter—a far cry from the climate in Belize. Mr. Moody quickly began working to help provide for his siblings and mother, working in a factory at Avon that required long public-transit commutes and slowly learning the English language. Eventually, his family moved from Chicago to Los Angeles. (PSR ¶ 64.)

It was here that Mr. Moody married the love of his life, Darina Galvez. The two had known each other since they met in Belize. Mr. Moody's pride and joy are his two

stepsons. He fathers them as if they were his own sons, just like his own stepfather had taught him. He enjoys spending time with his two stepsons, including the youngest who has developmental and health issues that have made school difficult, and helping them grow into mature young men. Importantly, he has not shied away from his misconduct; instead, he has used it as a teaching moment to ensure that when his sons are tempted, they do not make the same choices he made: "[H]e has communicated his experiences to friends and family so that none of them make the same mistake." Ex. B (Ltr. of Moises Shoman). Conduct like this evinces not just his true remorse, but also his determination not to reoffend in the future.

## IV.   CONCLUSION

Mr. Moody has lived a simple life in the United States, working blue-collar jobs for low wages to support his immediate family, mother, and disabled brother who cannot work on his own. (*See* PSR ¶¶ 60, 64.) He has no criminal history and, through family support and his own determination, was able to overcome difficult circumstances in his home country, Belize. He erred, but he has also shown true remorse, taken important steps to rectify his misconduct, and has already been punished by losing his job of almost a decade moving cargo at LAX. For the foregoing reasons, the defense asks that the Court sentence Mr. Moody to a probationary term with a period of home confinement, which is in-line with the 4-month sentence his co-defendant received. (*See* ECF No. 54.)

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: June 16, 2022

By  */s/ Michael D. Driscoll, Jr.*
MICHAEL D. DRISCOLL, JR.
Deputy Federal Public Defender
Attorney for MARLON MOODY

6